**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| MARIE-PAULE RENOIR, *et al.*, § | |
| § | |
| Plaintiffs, § | |
| § | |
| v. § | CIVIL ACTION NO. H-05-4152 |
| § | |
| HANTMAN'S ASSOCIATES, INC., § | |
| *et al.*, § | |
| § | |
| Defendants. § | |

**MEMORANDUM AND ORDER**

Plaintiffs Marie-Paule Renoir and the Paul Renoir and Marie-Paule Renoir Revocable Living Trust (the "Trust") sued Hantman's Associates, Inc. d/b/a Hantman's Auctioneers ("Hantman's") and Paula Hantman in Texas state court, asserting claims for breach of fiduciary duty, anticipatory breach of contract, fraud by intentional misrepresentation, fraud by nondisclosure, violations of the Texas Deceptive Trade Practices-Consumer Protection Act, TEX. BUS. & COM. CODE § 17.41 *et seq.* (the "DTPA") by false, misleading, or deceptive acts or practices and by unconscionable actions or course of action, and unjust enrichment. Defendants removed the case to this court on the basis of diversity jurisdiction and filed a motion to dismiss on the ground that they did not have the minimum contacts with Texas necessary for personal jurisdiction. (Docket Entry No. 4). Plaintiffs have responded, (Docket Entry Nos. 10, 12), and the defendants have replied, (Docket Entry No. 14). After reviewing the pleadings, the motion and responses, the parties' submissions, and the

applicable law, and hearing argument from the parties, this court grants the motion and dismisses the case for lack of personal jurisdiction. The reasons are explained below.

## I. Background

This case arises out of a dispute over the sale of memorabilia that had belonged to Pierre-Auguste Renoir. On June 15, 2004, Hantman's, an art auction and appraisal company, entered into a contract with the plaintiffs, Renoir family members, to attempt to sell the "Pierre-Auguste Renoir Personal Artifacts and Archives Collection" through public auction. Hantman's is a Maryland corporation that has its only office in Maryland. Its president, Paula Hantman, lives and works in Maryland.

Most of the relevant facts are undisputed. Hantman's first learned about the Renoir collection from Eckert Fine Art, a Florida art dealer. In February 2004, Eckert Fine Art contacted Hantman's to solicit its interest in handling the sale of the collection. (Docket Entry No. 10, Ex. A, ¶¶ 4–6; Ex. B). Eckert sent an appraisal with samples of letters and photos from the collection and invited Hantman's to respond. Discussions between Paula Hantman and Jane and Henry Eckert followed. Paula and Michael Hantman eventually traveled to Florida to view the collection. In April 2004, Hantman's mailed a proposal for selling the Renoir collection and a draft proposed "Live Gallery-Ebay Simulcast Auction Consignment Contract" to the Renoirs, care of Eckert in Florida. Eckert forwarded the materials to the Renoirs. The draft contract contained a choice-of-law clause that specified Maryland law. (Docket Entry No. 10, Ex. C, ¶ 17).

Hantman's first direct contact with the Renoirs and the Trust occurred in May 2004

and was initiated by Bill Vaughn, Marie-Paule Renoir's son-in-law. The record includes a number of emails between Paula Hantman on behalf of Hantman's and Bill Vaughn on behalf of the Renoirs and the Trust. Vaughn is neither a lawyer nor an art dealer, but rather in the construction business in College Station, Texas, where Marie-Paule Renoir also lived. Vaughn contacted Hantman's to discuss the proposed contract for selling the collection. Paula Hantman (in Maryland) and Bill Vaughn (in Texas) negotiated through telephone, mail, and email communications. On June 15, 2004, the parties executed a contract under which Hantman's would sell the collection on behalf of the Trust on a consignment basis. The contract included a statement that each lot would be sold without a "reserve figure," a "confidential minimum price beneath which property will not be sold." (Docket Entry No. 10, Ex. E, ¶ 4). The contract also set a commission schedule.

The choice-of-law clause in the executed contract was the same as that included in the draft contract Hantman's sent to Eckert and through it to the Renoirs, but the word "Texas" was substituted for the word "Maryland," making Texas law applicable to any disputes arising under the contract. (*Id.* at ¶ 17). Paula Hantman denies making the change or even knowing it had been made when she executed the contract on behalf of Hantman's. To the contrary, Paula Hantman insists that she has never drafted or presented a contract with a Texas choice-of-law provision. Marie-Paule Renoir also denies drafting the choice-of-law provision, but there is no affidavit from Bill Vaughn as to his involvement in revising the contract provisions on behalf of Marie-Paule Renoir and the Trust. It is undisputed that as signed, the contract specified Texas law.

On June 23, 2004, Paula Hantman traveled to Florida to take possession of what was represented as the complete Renoir collection from Eckert. Hantman shipped the collection to Maryland, where it was unpacked and examined. Hantman's then discovered that many of the items the Trust had listed as part of the collection were not included in what Hantman's received or were not in the condition described. In August 2004, Paula Hantman made a visit to Texas to address the inconsistencies between the inventory Hantman's had received from Florida and the description of the collection inventory the Trust had provided through Eckert. In that visit, Marie-Paule Renoir and the Trust provided Hantman's some items that were missing from the collection as described and added one item that was not included in the description, a watercolor. Paula Hantman's one trip to Texas lasted one day.

After further telephone and email communications between Paula Hantman and Bill Vaughn, Hantman's notified the Trust in an October 28, 2004 letter that there were still discrepancies between the July 17, 2001 Fair Market Appraisal Report for the collection and the actual collection Hantman's had received in Florida and added to during Paula Hantman's visit to Texas. Hantman's had used the Appraisal Report as the basis for the June 2004 consignment contract. Based on these discrepancies, Hantman's lowered its estimate of the collection's value to approximately $200,000 and proposed a contract amendment to the sales commission structure. In December 2004, Hantman's in Maryland and the Trust in Texas signed the amendment.

In April 2005, the parties signed a contract addendum to provide potential purchasers assurance that no third-party copyright claims existed, allowing a purchaser to obtain any

copyrights. The negotiations for this addendum, like the initial negotiations, took place over telephone, mail, and email.

On May 14, 2005, Hantman's offered the collection for sale through a live auction in Maryland and on the internet. The Trust had not established a reserve or minimum price for the collection. Hantman's set the opening bid at $150,000. The auction did not attract a bid in this amount. Although Hantman's had earlier reported expressions of interest by a French museum, Paula Hantman states in her affidavit that no such representative attended the auction or made a bid. Hantman's then attempted to sell the collection to private buyers. Within a few weeks, Charles Slane, who lives in Ohio, contacted Hantman's about the collection and offered to pay $135,000. On June 5, 2005, Hantman's communicated the offer to the Trust and asked for consent to the sale, although Hantman's asserts that the contract did not require such consent. The Trust refused, stating that it would not agree to sell the collection for less than $750,000. Hantman's informed Slane's agent that the Trust would not agree to the sale. Slane's agent insisted that Hantman's had accepted the $135,000 offer and that the sale was final.

On June 7, 2005, Slane filed a lawsuit against the Trust in the United States District Court for the District of Maryland, asserting that it had a right to the collection. In August, Hantman's sent Marie-Paule Renoir a $100,100 check for the proceeds of the sale less commission, although Hantman's asserts that the commission was far less than the contractually-allowed amount. The check was cashed. On August 19, 2005, the Maryland lawsuit was dismissed. On August 18, 2005, the Renoirs and the Trust sued Hantman's and

5

Paula Hantman in the 127th Judicial Court in Harris County, Texas. In this suit, the plaintiffs asserted that they should have received over $1.5 million for the collection but only received $135,000 because of the defendants' breach of contract and fraud. The Trust served Paula Hantman through the Texas Secretary of State on November 9, 2005 and served Hantman's through the Texas Secretary of State on November 14, 2005. On December 5, 2005, the defendants filed a Special Appearance and Original Answer Subject to Special Appearance in state court. On December 8, 2005, the defendants timely removed the action to this court and moved to dismiss the lawsuit for lack of personal jurisdiction.

## II.     The Governing Legal Standards

A federal court sitting in diversity may exercise personal jurisdiction over a nonresident defendant if the long-arm statute of the forum state confers personal jurisdiction over that defendant and exercise of such jurisdiction by the forum state is consistent with due process under the United States Constitution. *See Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999). The Texas long-arm statute confers jurisdiction to the limits of due process. *Religious Tech. Ctr. v. Liebreich*, 339 F.3d 369, 373 (5th Cir. 2003); *see* TEX. CIV. PRAC. AND REM. CODE ANN. § 17.041–.045; *see also Electrosource, Inc. v. Horizon Battery Tech., Ltd.*, 176 F.3d 867, 871 (5th Cir. 1999) ( citing *Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex. 1990)). Due process permits the exercise of personal jurisdiction over a nonresident defendant when the defendant has "minimum contacts" with the forum state and the exercise of jurisdiction over the defendant does not offend "traditional notions of fair play and substantial justice." *Latshaw*, 167 F.3d at 211 (quoting *Int'l Shoe Co. v. State of Washington*,

326 U.S. 310, 316 (1945)).

A plaintiff bears the burden of demonstrating facts sufficient to support personal jurisdiction over a nonresident defendant. That burden is met by a *prima facie* showing; proof by a preponderance of the evidence is not necessary. *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002); *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000). "The court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Id.* "[O]n a motion to dismiss for lack of jurisdiction, uncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor." *D.J. Invs. v. Metzeler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 546 (5th Cir. 1985) (quoted in *Bullion v. Gillespie,* 895 F.2d 213, 217 (5th Cir. 1990)).

The "minimum contacts" aspect of the analysis can be established through "contacts that give rise to 'specific' personal jurisdiction and those that give rise to 'general' personal jurisdiction." *Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir. 1994). It is undisputed that Hantman's has no office in Texas; has no agent or representative in Texas; does no regular or ongoing business in Texas; and does not advertise in Texas. Hantman's is not subject to general personal jurisdiction in its corporate capacity. Similarly, the parties do not dispute that Paula Hantman has never resided in Texas, maintained a mailing address or telephone number in Texas, owned, rented, or leased any real property in Texas, paid any taxes to any county in Texas, maintained any bank accounts in Texas, filed suit or been sued in Texas

(other than this lawsuit), personally contracted with a Texas resident, performed any contract in Texas, solicited any type of personal business in Texas, and has never traveled to Texas to conduct any personal business. Paula Hantman contends that her trip to Texas for one day in the summer of 2004 was in her capacity as president of Hantman's. The issue is specific jurisdiction.

A court's exercise of specific jurisdiction is appropriate only when the nonresident defendant's contacts with the forum state arise from, or are directly related to, the cause of action. *Gundle Lining Const. Corp. v. Adams County Asphalt, Inc.*, 85 F.3d 201, 205 (5th Cir. 1996) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 446 U.S. 408, 414 n.8 (1984); *Religious Tech. Ctr.*, 339 F.3d at 375; *Quick Techs., Inc. v. Sage Group PLC*, 313 F.3d 338, 344 (5th Cir. 2002)). To determine whether specific jurisdiction exists, a court must "examine the relationship among the defendant, the forum, and the litigation to determine whether maintaining the suit offends traditional notions of fair play and substantial justice." *Gundle Lining Const.,* 85 F.3d at 205; *Helicopteros Nacionales*, 466 U.S. at 414 n.8. Even a single contact can support specific jurisdiction if the defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzeqicz*, 471 U.S. 462, 475 (1985).

A court may exercise specific jurisdiction when: (1) the nonresident defendant purposely availed itself of the privileges of conducting activities in the forum state; and (2) the controversy arises out of or is related to the defendant's contacts with the forum state.

8

*Freudensprung v. Offshore Tech. Serv.*, 379 F.3d 327 (5th Cir. 2004) (citations omitted). "The non-resident's 'purposeful availment' must be such that the defendant 'should reasonably anticipate being haled into court' in the forum state." *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415, 419 (5th Cir. 1993) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). Specific jurisdiction requires a sufficient nexus between the nonresident defendant's contacts with the forum and the cause of action. *Rittenhouse v. Mabry*, 832 F.2d 1380, 1390 (5th Cir. 1987).

**III.   Analysis**

The plaintiffs argue that Hantman's purposefully availed itself of the benefits and protections of Texas law by negotiating and contracting with the Trust and the Renoirs, who were in Texas. Specifically, the Trust notes the following events: (1) Hantman's telephoned them in Texas to discuss selling the collection; (2) Hantman's drafted and sent the contract to Texas for execution; (3) on June 15, 2004, Marie-Paule Renoir executed the contract in Texas on behalf of the Trust; (4) the defendants drafted the contract, which as executed included a choice-of-law clause selecting Texas law; (4) Paula Hantman traveled to Texas to meet with Marie-Paule Renoir in August 2004; (5) as a result of Paula Hantman's visit, additional items located in Texas were sent to Maryland to be included in the collection, including a Renoir watercolor that was not listed on the original collection inventory; (6) on December 29, 2004, Marie-Paule Renoir signed a contract amendment on behalf of the Trust, in Texas, changing the contract's commission structure; (7) Hantman's sent another proposed

9

contract addenda that Marie-Paule Renoir executed on the Trust's behalf, in Texas, on or about March 22, 2005, clarifying copyright transferability; (9) Hantman's sent proposed marketing materials to Texas for review and approval in the spring of 2005; (10) the Trust proposed changes to these materials, which Hantman's made and sent back to the Trust for further review; (11) on May 25, 2005, Hantman's contacted the Trust about a prospective buyer described as a "French museum" and asked if the Trust would execute a bill of sale in Texas directly to the buyer at a price of $175,000; (12) on June 3, 2005, Hantman's (through counsel) contacted the Trust in Texas by telephone with news of the Ohio buyer and asked if the Trust would execute a bill of sale in Texas directly to the buyer; (13) on June 3, 2005, Paula Hantman telephoned Marie-Paule Renoir in Texas asking the Trust to execute a bill of sale to the Ohio buyer; (14) Hantman's allegedly committed fraud because when it asked the Trust to approve the sale to the Ohio buyer, Hantman's had already improperly sold the collection to that buyer; (15) Hantman's allegedly helped the Ohio buyer sue the Trust for breaching the sales contract that the Trust had not authorized Hantman's to enter, in exchange for the buyer's promise not to sue Hantman's; and (16) Hantman's hand-delivered the check for the Ohio sale proceeds to Marie-Paule Renoir with a proposed release of all claims, but although Renoir cashed the check, she did not execute the release.  In short, the Trust argues that Paula Hantman's and Hantman's contacts with Texas and torts directed at Texas permit this court to exercise personal jurisdiction over them.

Hantman's and Paula Hantman emphasize that: (1) they did not solicit the plaintiffs to sell the collection; instead, the initial contact came from Eckert's in Florida and the first

communications with the plaintiffs were through Eckert's; (2) after Eckert's communicated with the plaintiffs, they initiated the continued communications with the defendants; (3) the plaintiffs, particularly Vaughn as an agent for Marie-Paul Renoir and the Trust, initiated many of the subsequent communications; (4) the defendants obtained the collection from Florida, not Texas; (5) the contract was negotiated and executed in both Texas (by plaintiffs) and Maryland (by defendants); (6) Paula Hantman did not go to Texas until after the contract was executed and went only because the plaintiffs had provided a written inventory and appraisal of the collection that did not match what the defendants received from Florida; (7) the contract addendum changing the commission structure was required by the discrepancies between the written inventory and appraisal the plaintiffs provided and the actual collection that was delivered, and the addendum was negotiated and executed in both Texas (by the plaintiffs) and in Maryland (by the defendants); (8) the live auction occurred in Maryland; (9) the contract called for no material performance in Texas other than the one-time payment of the sale proceeds; (10) the contract called for significant performance in Maryland, including all the appraising, marketing, and selling activities; (11) the plaintiffs unilaterally changed the Maryland choice-of-law provision in the draft contract Hantman's provided to a Texas choice-of-law provision, without negotiation or discussion; and (12) defendants did not make any tortious misrepresentations.

The Texas Supreme Court recently emphasized several essential aspects of a nonresident's "purposeful availment" of the privileges of conducting activities in the forum state necessary for personal jurisdiction in that state. "First, it is only the defendant's

contacts with the forum that count," not the "'unilateral activity of another party or a third person.'" *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005) (internal quotations omitted). "Second, the acts relied on must be 'purposeful' rather than fortuitous. Sellers who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to the jurisdiction of the latter in suits based on their activities. By contrast, a defendant will not be haled into a jurisdiction solely based on contacts that are 'random, isolated, or fortuitous.'" *Id.* (citations omitted).

The complaint alleges both breach of contract and tortious misrepresentation causes of action. To determine specific personal jurisdiction in a breach of contract case, the court must ask whether the nonresident's forum contacts were instrumental in the formation of the contract or its breach. *Burger King*, 471 U.S. at 478; *Religious Tech*, 339 F.3d at 375 ("In the specific jurisdiction rubric, only those acts which relate to the formation of the contract and the subsequent breach are relevant.").

"[M]erely contracting with a resident of the forum state is insufficient to subject the nonresident to the forum's jurisdiction." *Freudensprung*, 379 F.3d at 345 (citations omitted). As this circuit has stated:

> Although a single act by the defendant directed at the forum state can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted, entering into a contract with an out-of-state party, without more, is not sufficient to establish minimum contacts. Rather, in a breach of contract case, to determine whether a party purposefully availed itself of a forum, a court must evaluate "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing. . . ."

*Latshaw,* 167 F.3d at 211 (quoting *Burger King*, 471 U.S. at 479).

Hantman's initial contact about selling the collection came from Eckert, the Florida art dealer, and Hantman's initial contact with the plaintiffs was through Eckert. The fact that Hantman's did not solicit the business directly or initially from Texas weighs against finding personal jurisdiction. *See 3-D Elec. Co. v. Barnett Const. Co.*, 706 S.W.2d 135, 142 (Tex. App.–Dallas 1986, writ ref'd n.r.e.) (finding no personal jurisdiction when a third entity, whose jurisdictional contacts the court refused to impute to the defendant, had initially solicited the contract and the defendant later entered into the contract over the telephone); *Blair Commc'ns, Inc. v. SES Survey*, 80 S.W.3d 723, 729 (Tex. App.– Houston [1st Dist.] 2002, no writ) (finding no jurisdiction when the parties were initially put in contact with each other by a third party and subsequently entered into a contract that was performed outside the forum state).

After the plaintiffs responded to Eckert's inquiry, Hantman's then communicated directly with the plaintiffs in Texas, leading up to the execution of the contract. The contract negotiations took place by email, telephone calls, and written communications between Texas and Maryland. The Fifth Circuit has "held that an exchange of communications between a resident and a nonresident in developing a contract is insufficient of itself to be characterized as purposeful activity invoking the benefits and protection of the forum state's laws." *Spademan*, 772 F.2d at 1193 (citing *Hydrokinetics, Inc. v. Alaska Mech., Inc.*, 700 F.2d 1026, 1029 (5th Cir. 1982); *Charia v. Cigarette Racing Team, Inc.*, 583 F.2d 184,

187–88 (5th Cir. 1978); *Benjamin v. W. Boat Building Corp.*, 472 F.2d 723, 739 (5th Cir. 1973)).

The contract was executed in both Texas and Maryland. The fact that a nonresident enters into a contract with a Texas resident after communications related to the execution and performance of the contract and mails contract payment to the forum state does not establish personal jurisdiction over the nonresident. *See Freudensprung*, 379 F.3d at 344 ("this Court has repeatedly held that the combination of mailing payments to the forum state, engaging in communications related to the execution and performance of the contract, and the existence of a contract between the nonresident defendant and a resident of the forum are insufficient to establish the minimum contacts necessary to support the exercise of specific personal jurisdiction over the nonresident defendant"); *Holt*, 801 F.2d at 778 (finding no specific jurisdiction over nonresident defendant when that defendant entered into a contract with a Texas resident, sent an agreement and checks to Texas, and engaged in extensive telephonic and written communication with the plaintiff in Texas); *Stuart,* 772 F.2d at 1192–94 (finding no indication that the nonresident defendant intended to avail himself of the privilege of doing business in Texas and hence no specific jurisdiction where nonresident defendant contracted with Texas residents, directed letters and phone calls to Texas, shipped prototypes and products to Texas, negotiated a contract with plaintiffs that was to be governed by Texas law, and marketed his product in Texas).

The primary place of performance can be important to the personal jurisdiction analysis. *Freudensprung*, 379 F.3d at 345; *see also Jones v. Petty-Ray Geophysical,*

*Geosource, Inc.*, 954 F.2d 1061, 1068 (5th Cir. 1992) (noting that courts look to "the place of contractual performance to determine whether the making of a contract with a Texas resident is sufficiently purposeful to satisfy minimum contacts"). Hantman's performed by doing the work to arrange for the sale of the collection in Maryland and conducting the live auction in Maryland. The payment was delivered to Texas. The Trust performed by providing Hantman's access to the collection, which occurred primarily in Florida where Paula Hantman obtained the collection and shipped it to Maryland, and to a limited degree in Texas, where Paula Hantman went after the contract was executed to address discrepancies between the collection she had received and the written description and appraisal of the inventory that had preceded it. Courts have held that the fact that a Texas resident performs its contractual obligations in Texas does not create jurisdiction over a nonresident party in Texas. *See V.F., Inc. v. Pro Metals, Inc.*, 60 S.W.3d 320, 327 n.10 (Tex. App.–Houston [14 Dist.] 2001, review denied). The fact that a nonresident must send contractually-required payments to Texas is not a sufficient jurisdictional contact with Texas. *See Gundle*, 85 F.3d at 205; *Dudek v. Donald C. & Eleanor J. Glanville Revocable Trust*, 109 Fed. Appx. 657, 659 (5th Cir. 2004) (finding no personal jurisdiction over nonresident defendant trust when the sole contact was a contract that did not require performance other than payment by the defendant in the forum state); *Blair*, 80 S.W.3d at 730 ("We do not believe that initiating contract discussions with a Texas resident, and subsequently entering into a contract, in addition to making payment in Texas, are sufficient contacts with Texas when the entire substance of the contract is performed outside the state."); *Patterson v. Dietze, Inc.*, 764 F.2d

15

1145, 1147 (5th Cir. 1985) (noting that an agreement to mail checks into the forum state does not weigh heavily in the minimum contacts calculus). The limited performance in Texas does not create personal jurisdiction over the defendants in this case.

The contract the parties executed did contain a Texas choice-of-law provision. "[A] choice-of-law provision should neither be ignored nor considered sufficient alone to confer jurisdiction." *Electrosource*, 176 F.3d at 873; *Pro Metals*, 60 S.W.3d at 327 n.10. Both sides accuse the other of drafting the Texas choice-of-law clause. It is clear from the record that the initial contract draft supplied by Hantman's specified that Maryland law would apply. At some point, the word "Maryland" was deleted and "Texas" substituted, leaving the clause otherwise unchanged. Paula Hantman denies making this change and asserts that she has never drafted a contract choosing Texas rather than Maryland law. Marie-Paul Renoir denies making this change. As noted, there is no affidavit from Vaughn, Renoir's son-in-law who was primarily involved in the negotiations and communications on her behalf. This record does not permit an inference that by executing a contract with a Texas choice-of-law provision, defendants anticipated local jurisdiction or intended local availment.

Paula Hantman's one-day visit to Texas to meet with the Renoirs is also insufficient to establish specific jurisdiction. Hantman evinced no intent to return again to the state or to avail herself—personally or on behalf of Hantman's—of the benefits of Texas law. Paula Hantman traveled to Texas after the parties had already executed the contract, which was not negotiated in Texas. She went to Texas solely to address discrepancies between what was described as included in the collection she obtained from Florida and the actual collection

16

she shipped to Maryland and inspected. Paula Hantman had to visit Texas to obtain pieces that were included in the written inventory and appraisal but missing from the actual collection the plaintiffs provided. During her visit, she obtained an additional piece for the collection, not described in the inventory, to try to increase the collection's value and bring it closer to the appraisal the plaintiffs had provided. The visit was necessitated by problems in the collection the plaintiffs had provided. When the parties negotiated and executed the contract, they believed the entire collection was in Florida and shipped to Maryland. Paula Hantman's trip to Texas took place because this entire collection was not in Florida or not in the condition described. The trip was to address items that were only fortuitously in Texas as opposed to Florida and then Maryland. Paula Hantman did not travel to Texas to initiate contact with the Trust, to negotiate the contract, or to further an ongoing relationship in the state. Her lone visit to Texas does not support a specific jurisdiction finding.

The parties did not contemplate a long-term relationship. Hantman's was to try to sell the collection through its Maryland office. The ongoing negotiations the Trust cites related to this one-time event, which the parties intended to take place outside Texas. Nor do the circumstances of the alleged contract breach provide a basis for personal jurisdiction over the defendants. The alleged breach took place in Maryland, where Hantman's arranged to sell the collection to the Ohio buyer and handled the postsale events. The present record shows even sparser contacts with Texas than in *Stuart v. Spademan*, in which the court concluded that it lacked personal jurisdiction over a defendant who negotiated and closed a

17

contract in Texas, sent two shipments of goods into Texas, and mailed payment to the plaintiff in Texas. The contacts plaintiffs cite do not support a finding of personal jurisdiction.

The plaintiffs also rely on their allegations that the defendants made misrepresentations directed to the plaintiffs in Texas, in telephone and email communications. The Texas Supreme Court has recently addressed whether similar allegations can serve as a basis for personal jurisdiction over nonresident defendants. In *Michiana Easy Livin' Country, Inc. v. Holten*, the Court made it clear that allegations of tortious misrepresentations made by telephone to the forum state can not be the basis for determining specific personal jurisdiction. In *Holten*, the Court expressly rejected personal jurisdiction based on where the defendant allegedly "directed-a-tort," as opposed to where the defendant's contacts related to the transaction and events at issue discussed. The Court noted that focusing on where the defendant allegedly directed a tort incorrectly emphasized the relationship among the plaintiff, the forum, and the litigation, rather than among the defendant, the forum, and the litigation. The minimum-contacts analysis properly focused "solely on the actions and reasonable expectations of the defendant." 168 S.W.3d at 790 (citing *Burger King*, 471 U.S. at 481–82). Second, "directed-a-tort" jurisdiction conflated the jurisdictional inquiry with the underlying merits, because the nonresident could defeat jurisdiction by showing that there was no tort. Third, the Court noted that the personal jurisdiction outcome should not turn on whether the defendant is sued in tort or contract, but on the defendant's purposeful availment. And fourth, reliance on telephone calls—and

email—can no longer reliably prove purposeful availment, given the fact that technology now permits an individual located anywhere in the world to be reached by a single telephone number or a single email address. "[C]hanges in technology have made reliance on phone calls obsolete as proof of purposeful availment. While the ubiquity of 'caller ID' may allow nonresidents to know a caller's telephone number, that no longer necessarily indicates anything about the caller's location. If jurisdiction can be based on phone conversations 'directed at' a forum, how does a defendant avail himself of any jurisdiction when it can never know where the other party has forwarded calls or traveled with a mobile phone?" *Id*. at 790. The Trust's arguments that Hantman's perpetrated a fraud (and related torts) "in Texas" by contacting the Trust from Maryland with allegedly false information by telephone and in writing do not establish personal jurisdiction.

The Trust has failed to demonstrate that Paula Hantman and Hantman's purposefully availed itself of Texas's laws and benefits to permit the Trust to sue the defendants in Texas.[1]

## IV.    Conclusion

The defendants' motion to dismiss this case for lack of personal jurisdiction is granted. This court will enter a separate order dismissing this case for lack of jurisdiction.

SIGNED on April 18, 2006, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge

---

[1] Because the court lacks jurisdiction over Paula Hantman under the existing record, this court need not address her alternative argument that the fiduciary shield doctrine prevents the Trust from suing her in Texas in Hantman's personal capacity.